Filing # 85755208 E-Filed 03/01/2019 03:57:26 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO.:
DIVISION:

LAN LI; YING TAN; TAO  XIONG; JUNQIANG FENG;
RAN CHEN; XIANG SHU; HAO LOU; XIANG CHUNHUA;
KUANG YAOPING; BEI ZHU; QIONG DENG;
QIONGFANG ZHU; ZHILING GAN; CUILIAN LI;
YULONG TANG; LILI ZHANG; SHUANGYUN WANG;
WENHAO ZHANG; SHA SHI; YAJUN KANG;
DONGSHENG ZHU; RUJING WEI; CHAOHUI LI; JUEWEI
ZHOU; MIN LI; CHUNNING YE; HONGRU PAN;
YUANBO WANG; SHU JIANG; YING FEI; LI
DONGSHENG; XIAONAN WANG; CHENGYU GU; YAN
CHEN; TANG CHEOK FAI; MOHAMMAD ZARGAR;
SHAHRIAR EBRAHIMIAN; REZA SIAMAK NIA; SARA
SALEHIN; SANAZ SALEHIN; ALI ADAMPEYRA;
MOHAMMADREZA SEDAGHAT; and HALIL ERSEVEN

     Plaintiffs,

V.

PNC BANK, N.A. and RUBEN RAMIREZ, an
individual.

     Defendants.

_____/

## COMPLAINT

Plaintiffs, LAN LI, YING TAN, TAO XIONG, JUNQIANG FENG, RAN CHEN, XIANG

SHU, HAO LOU, XIANG CHUNHUA, KUANG YAOPING, BEI ZHU, QIONG DENG,

QIONGFANG ZHU, ZHILING GAN, CUILIAN LI, YULONG TANG, LILI ZHANG,

SHUANGYUN WANG, WENHAO ZHANG, SHA SHI, YAJUN KANG, DONGSHENG ZHU,

RUJING WEI, CHAOHUI LI, JUEWEI ZHOU, MIN LI, CHUNNING YE, HONGRU PAN, ,

YUANBO WANG, SHU JIANG, YING FEI, LI DONGSHENG, XIAONAN WANG,

CHENGYU GU; YAN CHEN and TANG CHEOK FAI;  (collectively, the "Chinese Victims"),

along with MOHAMMAD ZARGAR, SHAHRIAR EBRAHIMIAN, REZA SIAMAK NIA,

SARA SALEHIN, SANAZ SALEHIN, ALI ADAMPEYRA and MOHAMMADREZA

1

SEDAGHAT (collectively, the "Iranian Victims") and HALIL ERSEVEN (the "Turkish Victim") (collectively, the Chinese Victims, the Iranian Victims and the Turkish Victim will be collectively referred to as "Plaintiffs"), sue Defendants, PNC BANK, N.A., a National Association ("PNC") and  RUBEN RAMIREZ, individually ("RAMIREZ") and say:

## INTRODUCTION AND HOW THE FRAUD WAS IMPLEMENTED

### Introduction

1.      PNC's General Counsel Gregory B. Jordan calls PNC a company "Focused on doing the right thing and acting with integrity and ethics." If that were true, this case would be wholly unnecessary.

2.      Plaintiffs are EB-5 Investors who were some of the unwitting victims of a $50 million fraud, theft and conspiracy, aided and abetted by PNC.  Plaintiffs are all foreign nationals desirous of leaving their home countries, whether it be China, Iran or Turkey, to provide themselves and their families with the opportunity for a better life in the United States by a program, known as the EB-5 Immigrant Investor Program (the "EB-5 program"), designed to promote both foreign investment and the creation of jobs for United States citizens. Plaintiffs, thanks to the assistance of and creation of a fake escrow account by PNC, were induced to make investments in the "Palm House Hotel," that was offered as a project in the EB-5 program.  The specifics of the EB-5 program are described more fully in Paragraphs 60 through 82 below.

3.      Instead, Plaintiffs' pursuit of the "American Dream" was shattered by those who promised them the world but lied and took everything from them.  RAMIREZ and PNC directly enabled that fraud by suggesting a "workaround" that allowed Plaintiffs' investments monies to be stolen.

4.      To be clear, the willful acts of RAMIREZ and PNC enabled Plaintiffs to be defrauded by Joseph Walsh ("Walsh"), Joseph Walsh, Jr.("Walsh Jr."), J. Marcus Payne ("Payne"), South Atlantic Regional Center, LLC ("SARC"), USREDA, LLC ("USREDA"), JJW

Consultancy, Ltd., Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Palm House, LLC, 160 Royal Palm, LLC, Palm House PB, LLC, Mirabia, LLC, Bonaventure 22, LLC, Alibi, LLC, Alibi Ltd., Nicolas Laudano, New Haven Contracting South, Inc., Botticelli Advisors, LLC, NJL Development Group LLC, Ali Herischi, ("Herischi') Herischi & Associates, LLC and KK-PB Financial, LLC (collectively, the "Bad Actors"), along with Leslie Robert Evans, and Leslie Robert Evans & Associates, P.A. (the "Evans Bad Actors) and Palm House Hotel, LLLP.

5.     Various of the Bad Actors, aided and abetted by RAMIREZ and PNC, conspired to fraudulently induce Plaintiffs to each invest $500,000, plus a $40,000 - $60,000 "administrative fee," into a purportedly first class, five-star Palm Beach, Florida, real estate project, known as the "Palm House Hotel" (the "Project"). Anything but first class or five-star, the Project remains incomplete, abandoned and deteriorating, and it has become clear that the Project was nothing more than a façade behind which Plaintiffs' funds were stolen and distributed among the Bad Actors and the Evans Bad Actors. Indeed, 160 Royal Palm, LLC is in bankruptcy and the Project is scheduled to be sold on March 8, 2019. *See, In Re: 160 Royal Palm, LLC, Case No. 18-19441-EPK, United States Bankruptcy Court Southern District of Florida, West Palm Beach Division.*

6.     Plaintiffs' funds, EB-5 investment monies, were supposed to be held in an escrow account unless and until the United States government made its initial evaluation of the Project's prospects and signaled its approval by granting the I-526 immigration petitions (the "I-526's") filed by each Plaintiff. These representations regarding the existence of an escrow account (which were made repeatedly both orally and in writing) were critical to the fraud. Those lies misled Plaintiffs into believing their money would be absolutely secure and untouched until the I-526's were approved and were material in helping convince Plaintiffs to invest in the Project. Plaintiffs specifically relied on the creation and existence of a legitimate and secure escrow account before investing and would not have invested if they had known that there was no escrow account. There

was, however a fake escrow account, created at the suggestion of RAMIREZ and PNC, that afforded no protection for their investments, but created the appearance of the promised protection.

7.      **At RAMIREZ and PNC's suggestion and with RAMIREZ and PNC's help, only a fake escrow account was created**, (the "Fake Escrow Account") not a real one that would protect Plaintiffs' interests. As described below, RAMIREZ and PNC played an essential role in allowing Plaintiffs to be defrauded by allowing the creation of a false appearance that a legitimate EB-5 escrow account had been created when it had not been.  PNC and RAMIREZ then stood by through at least May 2017 and did nothing while the Fake Escrow Account was looted, and the Bad Actors took all of Plaintiffs' money.  Indeed, RAMIREZ and PNC suggested, created and implemented the very circumstances that enabled the circumvention of all escrow requirements and gave unfettered access to Plaintiffs' money without regard for whether the Plaintiffs' investments were stolen. Not a single Plaintiff had an I-526 approved by the United States government yet every penny of Plaintiffs' money was taken from the Fake Escrow Account set-up by RAMIREZ and PNC. To make matters worse, both PNC and RAMIREZ benefitted form the creation of the Fake Escrow Account.

8.      Had Plaintiffs' I-526's ever been approved, the only legally permitted use of the funds would have been to create at least 10 full-time jobs (per investor) for qualifying U.S. workers, in this case by:

(a)     finishing the renovation and development of an existing luxury hotel structure in Palm Beach (i.e., the Project);

(b)     serving Palm Beach County by seeking to create jobs and increase U.S. exports by developing an upscale resort hotel; and

(c)     creating at least 790 direct and indirect jobs to support the EB-5 guidelines and the number of investors Plaintiffs were misleadingly told were being sought (while in reality some 91 EB-5 Investors were duped into investing).

9.      On information and belief, the Bad Actors, by and through Walsh, SARC and USREDA originally turned to SunTrust Bank and opened a legitimate escrow account to deposit other EB-5 Investors' (i.e., not the Plaintiffs here) fraudulently obtained investment monies from

other EB-5 projects. The SunTrust escrow account was used prior to the time the Chinese Victims, Iranian Victims and Turkish Victim were fraudulently induced to invest in the Project. However, SunTrust's EB-5 escrow compliance requirements were too "cumbersome" for the Bad Actors (i.e., the Bad Actors could not convert and steal the defrauded investors' money easily enough), so Walsh, SARC and USREDA decided to move the EB-5 investment monies to another bank that would make it easier for them to get their hands on it. That's when the Bad Actors first turned to RAMIREZ and PNC.

10.     In order to help facilitate the fraud, Walsh was insistent upon finding another bank that would essentially cut through the "obstacles and red tape" that existed at SunTrust. Eliminating the "obstacles and red tape" would give Walsh, SARC, USREDA, the BAD ACTORS and Evans Bad Actors access to the investors' fraudulently obtained investment monies (including, eventually, Plaintiffs' EB-5 investment monies) without having to comply with SunTrust's stringent escrow requirements as well as the requirements of the EB-5 program.

11.     Anthony "Tony" Reitz worked with Walsh from approximately January 2011 through February 2015. Reitz was employed as the Chief Financial Officer of SARC and USREDA, and while he worked for those companies, he took orders directly from and reported to Walsh.

12.     Finding the right bank and breaking free of the shackles of the escrow requirements at SunTrust (as well as the fraudulent misrepresentations that they would keep Plaintiffs' money in escrow until their I-526's were approved) were critical aspects of the fraud.

13.     Reitz had a prior long-standing banking relationship with PNC, especially with his friend, RAMIREZ, a business banker and Vice-President at one of PNC's Boynton Beach locations.

14.    In order to satisfy Walsh's repeated demands to find a new bank, Reitz offered to introduce Walsh, SARC and USREDA to RAMIREZ and PNC.

15.    PNC and RAMIREZ agreed to meet with Reitz, as the representative of Walsh, SARC and USREDA, and the initial meeting took place at Walsh's offices in Delray Beach, FL. The initial meeting was also attended by RAMIREZ and a person whose name, on information and belief, is Daniel Osaba ("Osaba"), a member of PNC's Treasury Department.

16.    When Reitz met with RAMIREZ and Osaba on behalf of Walsh, SARC and USREDA, he explained the nature of Walsh/SARC and USREDA's EB-5 business in great detail. Reitz also explained to Osaba and RAMIREZ that Walsh/SARC wanted to open an escrow account and specifically disclosed the following, among other things, to RAMIREZ and PNC:

(a)    Walsh, SARC and USREDA were working on EB-5 projects and were bringing in investors from China (at that time no Iranian or Turkish investors had been signed up yet);

(b)    there would be investors from other countries in the future;

(c)    each Chinese EB-5 investor was investing $500,000 plus an administrative fee of between $40,000 and $60,000;

(d)    there would be tens of millions of dollars running through any new accounts opened by RAMIREZ at PNC;

(e)    the EB-5 investment monies were subject to escrow agreements;

(f)    the relationship between Walsh, SARC and USREDA, because Walsh was in charge of the EB-5 projects and was making the decisions with respect to the EB-5 Investors' money;

(g)    Walsh and SARC already had an existing escrow account at SunTrust Bank;

(h)    Walsh was frustrated by what he felt were "obstacles and red tape" he was facing at SunTrust; and

(i)    Walsh, SARC and USREDA wanted a PNC escrow account that removed and/or eliminated the "obstacles and red tape" they were facing at Sun Trust.

17.    Reitz also discussed with RAMIREZ and Osaba PNC's requirements and procedures applicable to opening and maintaining an escrow account.

18.     After his initial meeting with RAMIREZ and Osaba, Reitz was told that PNC and SARC would have to sign an escrow administration agreement before PNC would open an escrow account for SARC.  Reitz was also told PNC would do the same thing as SunTrust if there was an escrow administration agreement and an escrow account was opened at PNC- that is, strictly adhere to the terms of the administration agreement.

19.     Walsh was extremely disappointed and unhappy at this news because such requirements would limit his ability to gain unrestricted access to the EB-5 Investors' investment monies.

20.     Reitz then specifically told RAMIREZ and PNC that signing an escrow administration agreement was not what Walsh was looking for.

21.     **RAMIREZ** and **PNC** then made the suggestion of a "workaround," opening a **business checking account** offering all of PNC's escrow services modules (the "Escrow Service Modules"), **as if the business checking account was a real escrow account, but it would not be an actual and real escrow account**.

22.     According to RAMIREZ, PNC would treat the account as a business checking account but Walsh and SARC could use the Escrow Service Modules as if the business checking account was an actual and real escrow account, thus making it appear to EB-5 Investors as though their money was being held in a bona fide escrow account. In reality RAMIREZ and PNC created the Fake Escrow Account and they, along with Walsh, SARC and USREDA, knew it was a fake and bogus account. One of RAMIREZ' jobs was to open up new business, so he stood to and did personally benefit from all of the business he and PNC did with Walsh, SARC and USREDA, at the expense of the EB-5 Investors. RAMIREZ told Reitz that "if you need functionality of an escrow account, we can provide the escrow service modules with this type of business checking account."

23.     On information and belief RAMIREZ and PNC's "workaround" (the "Workaround") violated its own Treasury Department rules and other internal rules, regulations and policies.

24.     RAMIREZ and PNC (because they both wanted the new business and the tens of millions of dollars of deposits – and substantial fees and interest– that came with it), offered the perfect Workaround solution. RAMIREZ and PNC suggested, engineered and implemented the Workaround as a way for Walsh/SARC and USREDA to circumvent PNC's own internal escrow account policies and quickly unlock the vault to Plaintiffs' investment monies, which the Bad Actors took for themselves, leaving Plaintiffs with virtually nothing.

25.     In the first step of the Workaround, RAMIREZ and PNC engineered the opening of an Analysis Business Checking Account in the name of South Atlantic Regional Center LLC – Royal Palm Town Center IV, LLLP (ending in ▇▇▇). This Fake Escrow Account remained in the name of South Atlantic Regional Center LLC – Royal Palm Town Center IV, LLLP from January 18, 2011 through January 31, 2011.

26.     In the second step of the Workaround, in order to create the illusion that the Analysis Business Checking Account was really an escrow account, PNC changed the name of the Fake Escrow Account from South Atlantic Regional Center LLC – Royal Palm Town Center IV, LLLP to South Atlantic Regional Center LLC – Royal Palm Town Center **Escrow Account**. By so doing, RAMIREZ and PNC knowingly made the Fake Escrow Account look like a legitimate escrow account with specific knowledge that while it was not one, it would appear like one and be used like one. This occurred on January 31, 2011, before any of the Plaintiffs were defrauded into wiring money into the Fake Escrow Account.  Throughout the existence of the Fake Escrow Account, PNC received fees for the services it provided to Walsh, SARC and USREDA (and indirectly to the Bad Actors and the Evans Bad Actors) in connection with the Fake Escrow

Account. In addition, PNC was able to invest the tens of millions of dollars that ran through the Fake Escrow Account, for its own benefit, while the money was held in the Fake Escrow Account.

27.     Likewise, RAMIREZ earned substantial income from PNC, which income increased and was enhanced as a result of the creation of the Fake Escrow Account and the tens of millions of dollars that ran through it.  In addition, RAMIREZ' reputation within PNC grew as a result of opening of the Fake Escrow Account, which was a feather in his cap.

28.     The third step of the Workaround to circumvent the "obstacles and red tape" associated with legitimate escrow accounts was to offer Walsh, SARC and USREDA the ability to add PNC's Escrow Services Modules to the Fake Escrow Account. RAMIREZ and PNC then actually added the Escrow Services Modules to the Fake Escrow Account to complete the false impression that the Fake Escrow Account was real. On information and believe this also overtly violated PNC's internal policies and procedures.  The Escrow Services Modules were not supposed to be added to Analysis Business Checking Accounts.  Even the training module for the Escrow Services Modules, on its face, makes clear that the Escrow Service Modules are meant for legitimate escrow accounts.

29.     The critical importance of this decision by RAMIREZ and PNC was that by connecting the Escrow Services Modules to the Fake Escrow Account, it gave the Fake Escrow Account the same outside appearance, manageability and functionality of one of PNC's legitimate escrow accounts.  However, it allowed Walsh, SARC and USREDA (and by extension the Bad Actors and Evans Bad Actors) to exercise illegal dominion and control over where the EB-5 Investors' money went. It also unlocked the Fake Escrow Account (without approval of even a single I-526) such that Walsh, SARC, USREDA, the Bad Actors and the Evans Bad Actors took the money without having to comply with any escrow agreements or any "obstacles or red tape" previously imposed by SunTrust on the Bad Actors and usually (absent the Workaround) imposed by PNC on legitimate escrow accounts.

30.     The impact of the totality of the Workaround was to create an account that was called "escrow," looked like a legitimate "escrow" account, had the ability to function like a real "escrow" account but was fake in every material aspect and imposed no escrow restrictions, all to the direct financial detriment of the EB-5 Investors. RAMIREZ and PNC helped cause the loss of tens of millions of dollars.  In addition, because the money was stolen and no jobs were created, Plaintiff's lost the ability to obtain permanent green cards and come to the United States for a better life for themselves and their families.

31.     PNC is well-versed in the EB-5 program and has specific institutional knowledge of how it works.  For example, in approximately June 2017, PNC's website included an article entitled "PNC Assists Ironstate Development in Rebuilding the Waterfront" a copy of which is attached as **Exhibit "A"** (the "EB-5 Article").  In the EB-5 Article, PNC brags about and markets its involvement, through PNC Capital Markets, LLC, as the "sole lead arranger of the [$100 million] credit facility" for the Navy Pier Court EB-5 Project in Staten Island, NY. The EB-5 Article also admits that the $161 million project included a "$25 million EB-5 Preferred Equity Investment" with PNC serving as "Administrative Agent." PNC provided the credit facility in 2013. So PNC clearly knows what the EB-5 program is, how it works and the fiduciary obligations that surround it.

32.     PNC was involved in the Navy Pier Court EB-5 Project until well after the fraud in this case began.  Specifically, PNC's Navy Pier Court credit facility was in place through February 2019 when it was refinanced. See https://rew-online.com/staten-island-urby-refinanced-with-133M-fannie-mae-loan

33.     PNC also markets itself to the EB-5 investments marketplace, as evidenced by the posting dated April 18, 2016 on the website called "EB-5 Investments-The EB-5 Investment Marketplace." See https://eb5projects.com/profile/firm/201-pnc-bank.  This post is still active and available.  Thus, PNC cannot feign ignorance as to the impact and importance of the Workaround

or how critical it is to an EB-5 Investor to know that her/his money will be held safely in an escrow account pending I-526 approval.

34.    Once the Workaround was fully implemented, there were no further impediments to convincing the Chinese Victims, the Iranian Victims and the Turkish Victim that their EB-5 investment monies and administrative fees were being wired into a legitimate escrow account and would be kept safe and untouched pending the approval of their I-526's. The creation of the Fake Escrow Account became the conduit that fed the Bad Actors' fraud machine and was a proximate cause of Plaintiffs' losses.

35.    In reliance upon the existence of the Fake Escrow Account, the Chinese Victims, the Iranian Victims and the Turkish Victim each wired their respective $500,000 EB-5 investments and $40,000 - $60,000 administrative fees into what they believed was a legitimate, completely safe escrow account.

36.    The Workaround, and the resulting Fake Escrow Account, was utilized by Walsh, SARC, USREDA and the Bad Actors to collect all of the funds that they later misappropriated from the Chinese Victims, the Iranian Victims and the Turkish Victim.

37.    In addition to the Workaround, PNC provided additional substantial assistance to Walsh, SARC, USREDA and the rest of the fraudsters, further empowering them to take Plaintiffs' EB-5 investment monies by creating yet another enabling account, this time a Business Enterprise Checking Account called Palm House Hotel LLLP Checking Operating Account (ending in ████) (the "Clearing Account").

38.    As described above, RAMIREZ and PNC had specific knowledge that the monies that would be deposited into the Fake Escrow Account would be EB-5 monies, as well as the legal implications of that fact.  Despite the fact that none of Plaintiffs' EB-5 investment monies were legally permitted to be used for any reason until their I-526's were approved, PNC and RAMIREZ did absolutely nothing to: (a) prevent the Bad Actors from taking Plaintiffs' money from the Fake

11

Escrow Account; (b) prevent the Bad Actors from moving the money stolen from the Fake Escrow Account into the Clearing Account; (c) prevent the Bad Actors from wiring money out of the Clearing Account to various other companies, individuals, or accounts controlled by the Bad Actors; (d) close the Fake Escrow Account until, on information and belief, May 2017; (e) close the Clearing Account until, on information and belief, May 2017; (f) inform the Chinese Victims the Iranian Victims or the Turkish Victim of the Bad Actors fraudulent acts; (g) inform the Chinese Victims, the Iranian Victims or the Turkish Victim of the misappropriation of their EB-5 investment monies from the Fake Escrow Account; or (h) inform the Chinese Victims, the Iranian Victims or the Turkish Victim of the further transfer of the EB-5 investment monies out of the Clearing Account.

39.     Once Plaintiffs' investment monies were deposited into the Fake Escrow Account, the majority of Plaintiffs' funds were improperly transferred from the Fake Escrow Account to the Clearing Account and pillaged for the personal pleasure of the Bad Actors and Evans Bad Actors. The remaining Plaintiffs' funds that were not improperly transferred to the Clearing Account were, on information and belief, transferred from the Fake Escrow Account into other accounts for the personal pleasure of the Bad Actors and the Evans Bad Actors.

40.     Virtually none of Plaintiffs' EB-5 investment funds were used to develop the Project, no jobs were created, and no EB-5 visas were issued to any of the Plaintiffs.  Accordingly, the defrauded foreign EB-5 Investors are now unable to leave their respective countries and have lost all the money they invested, and their dreams for a better life here in the United States for them and their families have been decimated.

41.     Instead, the Bad Actors and Evans Bad Actors stole Plaintiffs' funds and used them to, among other things:

    (a)    purchase multiple homes, investment properties, a 151-foot yacht that cost almost $6,000,000, payoff millions of dollars of personal debt (including more than $266,000 in personal back taxes), purchase luxury cars, vacations and other accoutrements of a life of luxury;

(b)    grease all the wheels that furthered the fraudulent scheme, including using licensed attorneys who had fiduciary duties, to help fraudulently induce investments.

42.    While it was the Bad Actors who masterminded the fraud against Plaintiffs, RAMIREZ and PNC, by offering what turned out to be the perfect solution to gaining access to Plaintiffs' investment monies without a single I-526 being approved, also played a substantial and essential role in the fraud. RAMIREZ and PNC were a proximate cause of the damages that were incurred by Plaintiffs by facilitating the conversion of their funds and giving the Bad Actors a key element to bolster and legitimize their most critical misrepresentations. RAMIREZ and PNC are jointly and severally liable for the Plaintiffs' damages.

43.    PNC and RAMIREZ aided and abetted the Bad Actors': (A) conversion of Plaintiffs' EB-5 investment monies; (B) fraud in the inducement; (C) fraud; and (D) breach of their fiduciary duties owed to Plaintiffs.

44.    PNC and RAMIREZ were was also unjustly enriched by their roles in the fraudulent scheme.

**How The Fraud Was Implemented**

45.    The fraudulent scheme operated as follows:

(a)    The Bad Actors preyed on Chinese, Iranian and Turkish investors seeking a path to United States residency for themselves and their minor children.

(b)    The Bad Actors fraudulently obtained $500,000 in EB-5 investment monies, plus $40,000 - $60,000 in administrative fees from each foreign investor, through the sale of alleged equity interests in Palm House Hotel, LLLP, a Florida limited liability limited partnership ("Palm House, LLLP") that would be involved in the development of the Project, claiming that the investment would qualify them under the EB-5 program administered by United States Citizenship and Immigration Services (the 'USCIS").

(c)    The Bad Actors materially, indeed crucially, represented, among other things, that:

    (i)    There was a 100% guaranty for the return of each Plaintiff's investment and fees in the event their I-526's were denied;

    (ii)    100% of Plaintiffs' funds **would be held in escrow** until their I-526's were approved by the United States government;

(iii)    A "limited number" of 79 equity interests would be sold in Palm House Hotel, LLLP at the price of $500,000 each, plus $40,000 - $60,000 in administrative fees;

(iv)    Plaintiffs' funds would be exclusively invested in the Project to create jobs by helping to finish the renovation and development, which was near completion;

(v)    The Project would be open for business by the "Season" of 2013/2014, and was 80-90% completed prior to Plaintiffs' investments;

(vi)    The funds would create 930 jobs, more than the required 790 full-time jobs (i.e., 10 per EB-5 investor);

(vii)    Plaintiffs' funds would be the third and final source of funds.  The EB-5 funds were in addition to an equity investment by Robert Matthews (an accused felon) in excess of $22,000,000 and a bank loan (by a bank that had done full due diligence justifying such a loan) in excess of $29,000,000.  Accordingly, Plaintiffs' funds constituted less than 50% of the Project funding;

(viii)    Plaintiffs' funds **would be held in escrow**, and were not yet needed, because Robert Matthews' investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 were being used for construction and renovation;

(ix)    Plaintiffs' funds **would not be taken from the escrow account**, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the Project;

(x)    The real property at issue was currently worth $110,000,000-$137,000,000 before completion, which made the investment "one of the safest EB-5 offerings from a Job Creation and Investment position."

(xi)    I-526's for the Project had already been approved by the United States government for the initial investors;

(xii)    An insurance policy was purchased by the Developer that guaranteed that construction of the Project would be completed;

(xiii)    The local government guaranteed that construction of the Project would be completed, and that this would be the last 5-star hotel property they would allow on Palm Beach;

(xiv)    The developer, Robert Matthews, was a famous real estate developer in the United States;

(xv)   Each investor's investment would be fully secured by the real property at issue and a UCC-3 (which EB-5 Investors were told was like a mortgage) filed in the State of Florida.  As there would be 79 rooms and 79 investors, each investor would be given a UCC-3 security interest in an individual room; and

(xvi)  Donald Trump and Bill Clinton (among other "rich and famous" dignitaries) would serve on the Palm House Hotel advisory board, would assist with any issues related to construction and would also play a key role in recruiting celebrities and dignitaries to the club. Celebrities such as Tony Bennett, Celine Dion, Bill Koch and Eric Schmidt purportedly were already members of the hotel club.

(d)   The Bad Actors targeted investors with children between the ages of 18 and 21 because, under the EB-5 program, applicants have the right to apply for a green card for themselves, their spouse, and unmarried children under 21.  Once the investor's funds were stolen and time continued to pass without the issuance of an I-526 approval, the Bad Actors would use the fact that the investor's child had "aged out" to silence the investor, perpetrate the continuing fraud, and prevent the investor from seeking redress or judicial assistance. The Bad Actors threatened the investors that, if the Project was interfered with or terminated, because the investor's child was no longer under 21, they would no longer be able to obtain a green card through their parent and would need to obtain their own EB-5 visa through at an additional cost of $500,000 plus administrative fees.

(e)   Later on in the fraud, as to any Plaintiff brave enough to question or demand the return of their investment, they were fraudulently told that, that additional appeals of the application process were in place, the country's foremost immigration attorney had been hired to prosecute the appeals, and all was well with the construction of the hotel, thereby further lulling Plaintiffs and falsely allowing the Bad Actors to deny any rights to reimbursement.  In truth, of course, the money was gone, no jobs were created, the federal government had closed the appeals, the immigration attorney was not retained to prosecute any appeals, and the I-526's were never issued.

46.   The representations made to induce Plaintiffs' investments into the Project were mostly lies, calculated to induce investments by those seeking to send their children to the United States for an education and the chance to pursue a life with more opportunities than those afforded to them in China, Iran and Turkey.

47.   Plaintiffs' I-526's were all denied, yet their funds were never returned.

48.   **There was no escrow account**.  There was only the Fake Escrow Account, an "escrow account" in name only, thanks to RAMIREZ and PNC.  Instead of holding Plaintiffs'

funds in escrow until their I-526's were approved, which would have kept the funds completely safe, the funds were diverted from the Fake Escrow Account, with RAMIREZ and PNC's assistance, knowledge and consent, into either the Clearing Account (and then to the Bad Actors, the Evans Bad Actors, and/or to individuals or entities or family members they controlled) or distributed among the conspirators, and used for their self-indulgences.

49.     Given unlimited access by RAMIREZ and PNC, Plaintiffs' funds were misappropriated and were used for unlawful purposes.

50.     Enabled by PNC's Workaround, the Bad Actors did not use Plaintiffs' funds to create 10 full-time jobs for (U.S. workers) for each EB-5 investor, which was the only legitimate purpose for the funds to come to the United States, and the only lawful use for the funds once the I-526's were approved (which they never were).

## PARTIES, JURISDICTION, AND VENUE

51.     This action involves, among other things, RAMIREZ and PNC's aiding and abetting breach of fiduciary duty, aiding and abetting conversion, aiding and abetting fraud in the inducement, aiding and abetting fraud, and unjust enrichment, each of which were perpetrated on Plaintiffs to obtain each of their EB-5 investments and "administrative fees" of $500,000 and $40,000 - $60,000, respectively.

52.     Plaintiffs are foreign nationals residing in China, Iran and Turkey that were fraudulently induced to each invest $500,000, plus $40,000 - $60,000 in administrative fees, based on the representations made by the Bad Actors and bolstered and facilitated by the use of the Workaround and the creation of the FAKE ESCROW ACCOUNT.  Plaintiffs were damaged by the fraud, which could not have been accomplished without the Workaround and Fake Escrow Account, as well as RAMIREZ and PNC's other actions and omissions.  RAMIREZ and PNC knowingly created, engineered and implemented the Workaround, as well as the Fake Escrow

Account and the Clearing Account, which enhanced the Bad Actors' ability to convert and distribute their ill-gotten gains.

53.     Defendant PNC BANK, N.A. is a National Association with its headquarters and principal place of business at The Tower at PNC Plaza, 300 5th Ave, Pittsburgh, PA 15222.  PNC conducts business throughout the State of Florida.  Among other things, PNC is engaged in the business of providing retail banking services to millions of customers, including customers in the State of Florida.  PNC is subject to personal jurisdiction in Florida because it operates, conducts, engages in, carries on a business or a business venture in Florida and/or committed a tortious act within Florida and/or is engaged in substantial activity within Florida. The Fake Escrow Account and Clearing Account at issue herein were opened in Boynton Beach, Florida. PNC is subject to the personal jurisdiction of this Court pursuant to, *inter alia*, Section 48.193 of the Florida Statutes because it is a foreign corporation actually conducting business in the State of Florida. Additionally, the causes of action alleged herein accrued in the State of Florida.

54.     RUBEN RAMIREZ is an individual who resides in Palm Beach County, Florida. RAMIREZ is a business banker and is employed by PNC as a Vice-President.  At all times relevant hereto, RAMIREZ worked at a PNC branch or branches in Boynton Beach, Palm Beach County, Florida and is otherwise *sui juris*. Additionally, RAMIREZ committed tortious acts within Palm Beach County, Florida and the causes of action herein accrued in Palm Beach County, Florida.

55.     This is an action for damages in excess of $15,000.00 exclusive of interest, attorneys' fees and costs.

56.     This Court has jurisdiction over PNC and RAMIREZ pursuant to §§48.193(1)(a)(1) and/or 48.193(1)(a)(2) and/or 48.193(2), Florida Statutes.

57.     Venue is proper in Palm Beach County, Florida, because a substantial part of the acts, transactions and events giving rise to the claims occurred in Palm Beach County, Florida. In

addition, PNC maintains offices and does business in Palm Beach County, Florida.  Moreover, RAMIREZ works and resides in Palm Beach County, Florida.

58.     All conditions precedent to this action have been performed, have occurred or have been waived.

59.     Plaintiffs have retained the undersigned counsel to represent them in this action and have agreed and are obligated to pay a reasonable fee for their services.

**GENERAL ALLEGATIONS**

**EB-5 Visa Program in General**

60.     The Immigrant Investor Program, more commonly known as the EB-5 program, was created by the Immigration Act of 1990.  Congress established the EB-5 program to stimulate the U.S. economy by giving immigrant investors the opportunity to permanently live and work in the United States after they have invested in a new commercial enterprise ("NCE"). In the case of an NCE that is located in a Targeted Employment Area ("TEA"), *i.e.,* either a rural area or an area beset by high unemployment, the required equity investment need only be $500,000.

61.     In 1993, Congress created the Immigrant Investor Pilot Program to increase interest in the EB-5 visa program. This new pilot program established EB-5 Regional Centers ("Regional Centers"), which are entities that receive special designation from the USCIS to administer EB-5 investments and create jobs.  Public and private entities may apply to the USCIS for approval as an EB-5 Regional Center.

62.     EB-5 visa programs administered by a Regional Center provide more flexibility, because the immigrant investor who invests in such a program is permitted to take credit not only for direct jobs created in the NCE but also "indirect jobs" created outside the NCE in a job creating enterprise ("JCE"). An example is such as a construction contracting firm that builds an improvement for the NCE.  In addition, the immigrant investor need not handle the day-to-day management of the NCE or even necessarily live in the region where the NCE is located.

63.     By necessity, investments into an EB-5 program are "closed-ended," available only to a specified number of investors, and that number is tied to the number of direct or indirect jobs created by the investment. If too few jobs are created with the money invested, the immigrant investor will not be able to become a permanent resident in the United States.

**EB-5 Practice and Procedure**

64.     Under the EB-5 program, the immigrant investor first applies for an immigrant visa by submitting an I-526, Immigrant Petition for Alien Entrepreneur.  USCIS' approval of the Form I-526 is conditioned upon the immigrant's investment of the requisite amount of money in an NCE that satisfies the applicable legal requirements.  Upon approval of the Form I-526 petition, the immigrant investor may either: (1) file the appropriate form to adjust their status to a conditional permanent resident within the United States; or (2) file an application to obtain an EB-5 visa for admission to the United States.  Upon the approval of the application or upon entry into the United States with an EB-5 immigrant visa, the EB-5 investor and derivative family members will be granted conditional permanent residency for a two-year period.

65.     To remove the conditional resident status, the immigrant investor must file a Form I-829, Petition by Entrepreneur to Remove Conditions, (an "I-829") ninety days before the two-year anniversary of the granting of the EB-5 investor's conditional resident status. USCIS' approval of the I-829 is conditioned upon proof that the immigrant investor's investment has created at least ten full-time jobs in the NCE or JCE.  If an insufficient number of jobs were created, the foreign national is subject to removal from the United States.

**EB-5 Program at the Palm House Hotel**

66.     SARC held itself out as an EB-5 Regional Center, headquartered in Palm Beach County, Florida, and claimed to specialize in investment-based immigration services.

67.     SARC was approved by USCIS to serve as a Regional Center, which allowed EB-5 Investors to take credit for direct and indirect jobs and not be involved in the day-to-day operation of the NCE.

68.     SARC was originally operated and controlled by Walsh, Walsh, Jr., and Payne.

69.     USREDA was an entity that claimed to specialize in providing legal immigration services regarding the EB-5 Visa program, held itself out as a law firm, and required clients to sign engagement letters for its services.  It charged clients $15,000.00 to file an I-526 and an additional $5,000.00 to file an I-829.

70.     USREDA was originally operated and controlled by Walsh, Walsh, Jr. and Payne.

71.     Beginning in 2013, Walsh and Walsh Jr., together with their agents, went to China to solicit the Chinese Victims regarding the EB-5 program at the Palm House Hotel.

72.     SARC, USREDA, Walsh, Walsh, Jr., Payne, and Robert Matthews retained Herischi to help them sell the Palm House Hotel fraud to the Iranian Victims.

73.     Herischi is an internationally recognized attorney, based in Washington, DC, who is well known to Iranians in both the United States and Iran.  Herischi speaks fluent Farsi, and frequently appears on international television to speak about Iranian political and refugee issues. Herischi holds himself out as an advocate for Iranians seeking a better life in the United States and has built a law practice on that basis.  Herischi understands the Iranian culture, the Iranian investment process, and the various investment features and safeguards that Iranian investors typically seek when making investments. One of the most critical safeguards was the promised escrow account coupled with the representation that the investments would be held and safe unless and until the I-526's were granted.  Herischi used this knowledge, his Iranian heritage, and his international reputation as a well-respected attorney to earn the trust of the Iranian Community, which enabled him to help swindle the Iranian Victims.

74.     Beginning in 2013, Herischi solicited the Iranian Victims regarding the EB-5 program at the Palm House Hotel.  This included co-hosting investment seminars and meeting with potential investors in luxurious hotels in Dubai.

75.     Eric Nan Nur is a South Florida real estate broker and is a prominent member of the Turkish-American community in Florida.  Nur is former President of the Florida Turkish American Chamber of Commerce, former President of the Florida Turkish Center Foundation, Inc., former President of the Florida Turkish American Association, former Vice-President of the Federation of Turkish American Associations, and former Vice-President of the Assembly of Turkish American Associations.  Nur served as a key agent for Walsh, Walsh Jr., Payne, SARC, USREDA and Robert Matthews, making substantial material, false representations that were integral in inducing the Turkish Victim to provide his investment.   One of the most critical representations was the promised escrow account coupled with the representation that the investments would be held and safe unless and until the I-526's were granted.  Nur speaks fluent Turkish and was the "mouthpiece" for the fraudulent statements made to the Turkish Victim.

76.     During the Palm House Hotel solicitations, Plaintiffs were provided with three (3) items:

(a)     Frequently Asked Questions (the "FAQ").  True and correct copies of the FAQ provided to the Chinese Victims and Iranian Victims are attached as **Exhibits "B" and "C"** respectively;

(b)     Sales Brochure (the "Sales Brochure").  True and correct copies of the Sales Brochures provided to the Chinese Victims and Iranian Victims are attached as **Exhibits "D" and "E,"** respectively; and

(c)     Signature Booklet (the "Signature Booklet").  True and correct copies of the Signature Booklets provided to the Chinese Victims and Iranian Victims is attached as **Exhibits "F" and "G,"** respectively.  Collectively, the FAQ, Sales Brochure, and Signature Booklet will be referred to as the "Offering Documents."

77.     While the Signature Booklet contained signature pages for a Private Placement Memorandum (the "PPM") and a Palm House limited partnership agreement (the "Palm House Limited Partnership Agreement"), Plaintiffs were not provided with copies of the full documents in their native languages.  In the event EB-5 Investors asked questions about the full documents, they were referred back to the FAQ and Sales Brochure and told that all of their questions were

answered there.  Copies of the English version of the Full PPM and Limited Partnership Agreement are attached as **Exhibits "H" and "I,"** respectively.

78.     Additionally, during the Palm House Hotel solicitations, the Chinese Victims were provided with a writing claiming that an I-526 petition for an early Palm House Hotel investor had been approved by USCIS, thereby assuring the Chinese Victims that, if they invested in the Project, they too would soon obtain approval (the "USCIS Approval"), a true and accurate copy is attached as **Exhibit "J."**

79.     The representations in the Offering Documents, the PPM, the Palm House Limited Partnership Agreement, and the USCIS Approval were originally made by Walsh, Walsh Jr. and Payne on behalf of their companies, SARC and USREDA.

80.     JJW Consultancy Ltd. and its agents adopted and sold the representations in the Offering Documents and the USCIS Approval when selling the Project to the Chinese Victims.

81.     Nur adopted and sold the representations in the Offering Documents when selling the Project to the Turkish Victim.

82.     Herischi, Herischi & Associates LLC and their agents adopted and sold the representations in the Offering Documents when selling the Project to the Iranian Victims.

**The Misrepresentations Used by The Bad Actors to Induce Plaintiffs to Invest Millions**

83.     SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Herischi, Herischi & Associates LLC, Nur, Robert Matthews and their agents each made material, knowingly false representations to induce Plaintiffs to invest in the Project.

84.     Further, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Herischi, Herischi & Associates LLC, Nur, Robert Matthews and their agents each withheld material information they had a duty to disclose.

85.     Each limited partnership unit in Palm House required a minimum EB-5 investment of $500,000, plus an administrative fee of $40,000 - $60,000.

86.     Any subscription funds received from Plaintiffs were to be held in a special escrow account that, as described above, as a result of the Workaround, ended up being the Fake Escrow Account.

87.     Among the many misrepresentations, Plaintiffs were promised that their EB-5 monies would be held in a special escrow account and released only if and when their I-526's were approved by USCIS (the "Fraudulent Escrow Representation").

88.     The Fraudulent Escrow Representation was made to Plaintiffs several times, and in several documents.

89.     The Fraudulent Escrow Representation was made to Plaintiffs in the PPM.  <u>See</u> Exhibit G at p. 15, 37, 38 and 41.

90.     The Fraudulent Escrow Representation was made to Plaintiffs in the Limited Partnership Agreement.  <u>See</u> **Exhibit H** at p. 6.

91.     The Fraudulent Escrow Representation was made in the loan agreement between Palm House and Palm House LLC (the "Loan Documents," attached as **Exhibit "K"),** where Palm House, LLC, on the one hand, and Walsh, SARC, and Palm House, on the other hand, agreed that the loan was dependent on USCIS' approval of Plaintiffs' I-526's.  <u>See</u> **Exhibit J** at p.1.

92.     The creation of the Fake Escrow Account by RAMIREZ and PNC helped sell and legitimize the Fraudulent Escrow Representation to Plaintiffs.

93.     If an investor's I-526 was denied by USCIS, the investor was promised that they would receive their money back within 90 days of the official denial notice.

94.     There were many other knowingly false representations in the Offering Documents, including but not limited to:

(a)     There was a 100% guaranty for the return of Plaintiffs' EB-5 investment and fees in the event their I-526's were denied;

(b)     There would be a maximum of 79 limited partnership units offered in Palm House;

(c)     They were seeking, in total, a $39,500,000.00 investment into Palm House, which was equal to the maximum of 79 limited partnership units being offered at $500,000 each;

(d)     USREDA guaranteed the approval of any I-526 it completed and the return of all service fees in the event of denial;

(e)     SARC was the general partner of Palm House;

(f)     The developer had already invested $22,000,000 of its own equity into the Project;

(g)     There was a bridge loan from a bank, in the amount of $29,500,000, to allow continuation of the construction while the EB-5 money was raised;

(h)     The EB-5 investment represented only 43% of the total investment in the Project;

(i)     The Project was in progress, "very near completion," and would be complete for "Season" of 2013/2014;

(j)     The Palm House Hotel would be the last 5-star hotel to be approved by the local government on Palm Beach;

(k)     Investors need not worry about any potential delays in building or regulatory issues;

(l)     Bill Clinton, Donald Trump, Celine Dion, Bill Koch, and Eric Schmidt would be a part of the Palm House Hotel advisory board;

(m)     The real property at issue, on which the Palm House Hotel was being renovated, was presently worth over $110,000,000 before completion.  "This makes the Palm House Hotel one of the safest EB-5 offerings from a Job Creation and Investment position."

(n)     The job count for the Palm House Project is 953 jobs, while the Project needs only 790 jobs, so over 20% more jobs will be created than required by law;

(o)     The investor's visa would be approved in less than 6 months; and

(p)     "The investor need not worry if the Project will perform and meet the rigid standards required by the USCIS."

95.     Armed with the Offering Documents, the USCIS Approval, the Fraudulent Escrow Representation, the Fake Escrow Account **created by RAMIREZ and PNC,** presentations, and whatever other oral representations they deemed necessary for a sale, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy, Ltd., Herischi, Herischi & Associates LLC, Nur, Robert Matthews and their agents sold the fraud that is the Project.

**The Chinese Investors Are Duped**

96.     Beginning in 2013, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy, Ltd., Robert Matthews and their agents fraudulently induced the Chinese Victims (directly and/or through their immigration agents) to provide their investments and wire their $500,000 EB-5 investment monies plus $40,000 - $60,000 in administrative fees into the Fake Escrow Account **created by RAMIREZ and PNC**.

97.     In China, SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents made presentations to the Chinese Victims (directly and/or through their immigration agents) using the Offering Documents, the USCIS Approval, the Fraudulent Escrow Representation, presentation materials, and oral statements.

98.     In China, SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents used a PowerPoint presentation (the "PowerPoint Presentation") that contained knowingly false representations to fraudulently induce the Chinese Victims (directly and/or through their immigration agents) A true and correct copy of the PowerPoint Presentation is attached as **Exhibit "L."**

99.     SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents represented to the Chinese Victims (directly and/or through their immigration agents) that the statements in the Offering Documents were true and accurate.

100.    SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents also made oral, materially false statements to the Chinese Victims (directly and/or through their immigration agents), including the Fraudulent Escrow Representation.

101.    In their solicitations to the Chinese Victims (directly and/or through their immigration agents), SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents stated that:

(a)     There was a 100% guaranty for the return of Plaintiffs' investment and fees in the event their I-526's were denied;

(b)     100% of Plaintiffs' funds would be **held in escrow** until their I-526's were approved by the United States government;

(c)     Plaintiffs' funds would be **held in escrow**, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction;

(d)     Plaintiffs' funds **would not be taken from the escrow account**, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had been used at the Project; and

(e)     If an investor's application was denied by USCIS, they would receive their money back immediately.

102.     SARC, USREDA, Walsh, Walsh Jr., JJW Consultancy, Ltd., and their agents made representations to the Chinese Victims' immigration agents with the understanding and intent that they would relay the representations to the Chinese Victims and that the Chinese Victims would rely upon those representations, because that was the nature of the trusting relationship between the Chinese investors and their immigration agents. That is exactly what happened.

103.     After the presentations in China, the Chinese Victims' immigration agents came to Palm Beach, Florida, to inspect the Project and meet with Robert Matthews and his agent.

104.     In Palm Beach, Robert Matthews and his agent reiterated that the Chinese Victims' funds **would remain in escrow** until their I-526's were approved.

**The Iranian Investors Are Duped**

105.     Beginning in 2013, SARC, USREDA, Walsh, Walsh Jr., Payne, Herischi, Herischi & Associates LLC, and their agents fraudulently induced the Iranian Victims to transfer their $500,000 EB-5 investment monies plus $40,000 - $60,000 in administrative fees into the Fake Escrow Account **created by RAMIREZ and PNC**.

106.     In the Middle East and in Washington, DC, Walsh, Herischi, Herischi & Associates LLC, and their agents made presentations to the Iranian Victims using the Offering Documents, the Fraudulent Escrow Representation, presentation materials, and oral statements.

107.    Walsh, Herischi, Herischi & Associates LLC, and their agents represented to the Iranian Victims that the statements in the Offering Documents were true and accurate.

108.    Walsh, Herischi, Herischi & Associates LLC, and their agents also made oral, materially false statements to the Iranian Victims, including the Fraudulent Escrow Representation, which statements were relied upon by the Iranian investors.

109.    In their solicitations to the Iranian Victims, Walsh, Herischi, Herischi & Associates LLC, and their agents stated that:

(a)    There was a 100% guaranty for the return of their Plaintiffs' investment and fees in the event their I-526's were denied;

(b)    100% of Plaintiffs' funds would be **held in escrow** until their I-526's were approved by the United States government;

(c)    Plaintiffs' funds would be **held in escrow**, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction; and

(d)    If an investor's application was denied by USCIS, they would receive their money back immediately.

**The Turkish Investor Is Duped**

110.    Beginning in 2012, Nur solicited the Turkish Victim regarding the EB-5 program at the Palm House Hotel.

111.    In South Florida, Nur made presentations to the Turkish Victim using the Offering Documents, the Fraudulent Escrow Representation presentation materials, and oral statements, which were relied upon by the Turkish investor.

112.    Nur represented to the Turkish Victim that the statements in the Offering Documents were true and accurate.

113.    Nur also made oral, materially false statements to the Turkish Victim.

114.    In solicitations to the Turkish Victim, Nur stated that:

(a)    There was a 100% guaranty for the return of investment and fees in the event the I-526 petition is denied;

(b)     100% of the investment funds would be **held in escrow** until the Form I-526 immigration petition was approved by the United States government;

(c)     Investment funds would be **held in escrow**, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 was being used for construction; and

(d)     If an investor's application was denied by USCIS, they would receive their money back immediately.

115.    After the presentations, the Turkish Victim came to Palm Beach, Florida, to inspect the project and meet with Robert Matthews. The Turkish Victim transferred his $500,000 investment plus $60,000.00 in administrative fees into the Fake Escrow Account created by RAMIREZ and PNC.

116.    In Palm Beach, Robert Matthews reiterated that the Turkish Victim's funds would **remain in escrow** until his I-526 petition was approved.

**Plaintiffs are Fraudulently Induced to Invest in the Palm House EB-5 Offering**

117.    Plaintiffs were provided with wiring instructions which included information provided by RAMIREZ and PNC (the "Wiring Instructions"). A true and correct copy of the Wiring Instructions are attached as **Exhibit "M"**. The title of the Wiring Instructions is "Escrow Bank Wire Transfer Instructions" and "Wiring Instructions for Depositing Funds into Escrow Bank." PNC is then identified as the "Escrow Bank." Significantly, the name of the Fake Escrow Account is identified as "Palm House, LLLP Escrow Account – Account # XXXXXX███," which is not the actual name of the Fake Escrow Account. Based upon the Wiring Instructions, which on information and belief RAMIREZ saw and approved of (as well as because of PNC's extensive institutional knowledge of the EB-5 industry), RAMIREZ and PNC knew or should have known of the Bad Actors' fraud. Of course, RAMIREZ and PNC knew or should have known of the Bad Actors' fraud from the date of the proposal of the Workaround and the creation of the Fake Escrow Account because of the Workaround, which RAMIREZ and PNC conceived of, engineered and implemented.

118.    The <u>actual</u> name of the Fake Escrow Account was South Atlantic Regional Center LLC – Royal Palm Town Center IV, LLLP Escrow Account.

119.    In reliance on the Offering Documents, the existence of the Fraudulent Escrow Representation, the Fake Escrow Account and the oral representations described above, each of the Chinese Victims provided a $500,000 EB-5 investment for a limited partnership unit in the Palm House Hotel, LLLP, along with an administrative fee of $40,000 - $60,000, which were wired into the Fake Escrow Account in accordance with the Wiring Instructions.

120.    In reliance on the Offering Documents, the Fraudulent Escrow Representation, the existence of the Fake Escrow Account and the oral representations described above, each of the Iranian Victims provided a $500,000 EB-5 investment for a limited partnership unit in Palm House Hotel, LLLP, along with an administrative fee of $40,000 - $60,000, which were wired into the Fake Escrow Account in accordance with the Wiring Instructions.

121.    In reliance on the Offering Documents, the Fraudulent Escrow Representation, the existence of the Fake Escrow Account and the oral representations described above, the Turkish Victim provided a $500,000 EB-5 investment for a limited partnership unit in Palm House Hotel, LLLP, along with an administrative fee of $60,000, which were wired into the Fake Escrow Account in accordance with the Wiring Instructions.

122.    Because Plaintiffs were provided the Wiring Instructions (which contained information created by RAMIREZ and PNC) telling them to wire their $500,000 EB-5 investments into the Fake Escrow Account, Plaintiffs instructed their respective banks to do just that.  A sample of a Remittance Application Form instructing that a wire be sent to the misnamed Palm House Hotel, LLLP Escrow Account (i.e. the Fake Escrow Account) is attached hereto as **Exhibit "N"**. Despite these obvious issues and red flags, PNC nevertheless deposited the $500,000 EB-5 investment from this wire into the Fake Escrow Account.

123.    Many of the Plaintiffs also paid USREDA a legal fee of $15,000-$20,000.

124.    Each of the Plaintiffs received confirmation receipts with PNC's logo on them (the "Wire Deposit Confirmations") that their $500,000 EB-5 investment and/or $40,000 - $60,000 administrative fee had been received by PNC.  An example of a Wire Deposit Confirmation is attached hereto as **Exhibit "O"**.  As a result, Plaintiffs believed that their EB-5 investment monies were being safely held in a special escrow account and that they would not be withdrawn, diverted or otherwise touched until such time as their I-526's were approved by the USCIS.

125.    Thus, the Workaround, as well as the creation of the Fake Escrow Account and the Clearing Account, directly contributed to and was a proximate cause of Plaintiffs' losses by enabling the Bad Actors to take Plaintiffs' EB-5 investment monies and use them illegally. Plaintiffs' receipt of Wire Deposit Confirmations further lulled them into the false sense of security that their money was safe in the **"escrow account" RAMIREZ and PNC conceived of, created and implemented**.

126.    In providing their money, Plaintiffs relied upon the representation that there was a 100% guaranty for the return of their investment and fees in the event their I-526's were denied.

127.    In providing their money, Plaintiffs relied upon the existence of the Fake Escrow Account and the Fraudulent Escrow Representation, and understood that **their money would be held in escrow** unless and until USCIS approved their I-526's.  RAMIREZ and PNC's acts and omissions not only enabled the Bad Actors to defraud Plaintiffs, but RAMIREZ and PNC were also a proximate cause of Plaintiffs' losses.

128.    In providing their money, Plaintiffs relied upon the representation that **their funds would be held in escrow**, and were not yet needed, because the developer's investment in excess of $22,000,000 and a bank loan in excess of $29,000,000 were being used for construction.

129.    In providing their money, Plaintiffs relied upon the representation that **their funds would not be taken from the escrow account**, and would not be used, unless and until the developer's investment in excess of $22,000,000 and the bank funds in excess of $29,000,000 had

been used at the Project.  All of these various "escrow account" representations were bolstered, facilitated and legitimized by the creation of the Fake Escrow Account by RAMIREZ and PNC.

**Plaintiffs' I-526's are Denied by USCIS and Plaintiffs Demand Their Money**

130.    Plaintiffs' I-526's were denied by USCIS for failure to establish by a preponderance of the evidence that the I-526's complied with the applicable legal requirements.  A copy of an example of such a denial is attached as **Exhibit "P."**

131.    USCIS cited the following deficiencies: (1) inconsistencies in the documents from Palm House Hotel, LLLP; (2) insufficient number of full-time positions created by the Project; (3) dispute over ownership of the Project's property; and (4) insufficient evidence of bridge financing.

132.    The deficiencies cited by USCIS were based on actions taken and documents provided by Palm House Hotel, LLLP, and over which Plaintiffs had no control.

133.    Plaintiffs demanded the return of their funds, but they were never returned.  PNC aided and abetted and allowed the Bad Actors to take the Chinese Victims', the Iranian Victims' and the Turkish Victim's money, and failed to do anything at all to stop it.  RAMIREZ and PNC knew or should have known of the fraud and were a proximate cause of Plaintiffs' losses.

134.    Plaintiffs' demands, however, fell on deaf ears.  Because of RAMIREZ and PNC's actions and inactions, no funds were returned to Plaintiffs because they were already long gone. Moreover, RAMIREZ and PNC did nothing to stop the fraud, and continued to host the Fake Escrow Account and the Clearing Account, allowing the fraud to continue until, on information and belief, May 2017. Sadly, RAMIREZ and PNC could have closed the Fake Escrow Account and the Clearing Account with the mere click of a button, sparing the EB-5 Investors from losing both their investment monies and any hopes of obtaining their permanent green cards.  Instead, all they did was watch the money and dreams disappear and collect PNC's interest, fees and costs.

**The Fraud and Theft are Discovered**

135.    Upon investigation, Plaintiffs discovered that a seemingly endless laundry list of fraudulent representations were perpetrated upon them in furtherance of obtaining and stealing their money.

136.    Palm House was not a legitimate EB-5 project, but rather a façade and vehicle pursuant to which a group of conspirators stole over $50 million from over 90 foreign nationals seeking EB-5 visas and a better life for their families in the United States.

137.    Plaintiffs have discovered that their funds were not held in a proper and legitimate escrow account.  Plaintiffs now know that the Workaround was implemented and their investment monies were instead held in the Fake Escrow Account, and that RAMIREZ and PNC changed the name of the Analysis Business Checking Account, labeled it an "escrow account," and attached its Escrow Services Modules to it, such that it looked like an escrow account to the unwitting outside world, but it was not created as and has never been a legitimate escrow account.  What Plaintiffs don't know is why RAMIREZ and PNC would help the Bad Actors take all of their money. Plaintiffs never would have wired their money into the Fake Escrow Account had they known it was not real.

138.    Instead, contrary to all written and oral representations, Plaintiffs' EB-5 investment funds, with the knowledge, consent and assistance of RAMIREZ and PNC, were transferred from the Fake Escrow Account to the Clearing Account and to other accounts and pillaged for the personal pleasure of the Bad Actors, the Evans Bad Actors and the conspirators.

139.    Virtually none of Plaintiffs' funds were used at the Project, and no jobs were created.

140.    Plaintiffs have learned that, with the knowledge, consent and assistance of RAMIREZ and PNC, their funds were wrongfully moved from the Fake Escrow Account to the

Clearing account, and to other accounts, and then disbursed and distributed among the conspirators and used to, among other things:

    (a)    purchase multiple homes, investment property, a 151-foot yacht that cost almost $6,000,000, a luxury car, vacations, and other accoutrements of a life of luxury;

    (b)    pay personal debts, including more than $266,000 in personal back taxes; and

    (c)    grease all the wheels that furthered the fraudulent scheme, including a licensed attorney that helped fraudulently induce the victims' investments.

141.    Each of the representations described hereinabove were knowingly false or misleading.

142.    Most of the representations within the Offering Documents were knowingly false or misleading.

143.    The representations that there was a 100% guaranty for the return of Plaintiffs' EB-5 investments and fees in the event their I-526's were denied were knowingly false.

144.    The Fraudulent Escrow Representation was knowingly false.

145.    The representations that Plaintiffs' funds **would be held in the escrow** unless and until USCIS approved their I-526's were knowingly false, but Plaintiffs fell for it, in part, because RAMIREZ and PNC created the Fake Escrow account, which tricked them into thinking their money would be safe.

146.    The representations that Plaintiffs would receive their money back upon an official denial of their I-526's by USCIS were knowingly false.

147.    The representations that Plaintiffs' funds **would be held in escrow**, and were not yet needed, because construction was being funded by the developer's investment and the bank loan, were knowingly false.  With RAMIREZ and PNC's knowledge, consent and assistance, after the implementation of the Workaround, the funds were removed from the Fake Escrow Account.

148.    In sum, the Palm House Hotel was a systemic fraud, based on myriad, intentional, material misrepresentations intended to dupe unsuspecting foreign investors looking for better lives for themselves and their families in the United States.  The Bad Actors and the Evans Bad

Actors, emboldened and empowered by the Workaround, literally stole the American Dream from the Chinese Victims, the Iranian Victims and the Turkish Victim.

149.    The Palm House Hotel was a necessary façade, used to enable the fraudulent scheme that bilked foreign investors with the promise of EB-5 visas and security for their investments.

**PNC's Substantial Role in Causing Plaintiffs' Losses**

150.    Plaintiffs have determined, by investigating the money trail, that SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Herischi, Nur, Herischi & Associates LLC, and their agents were parties to a fraudulent scheme to steal Plaintiffs' funds with several persons involved with the Project, including Robert Matthews, Maria a/k/a Mia Matthews, Gerry Matthews, Nicholas Laudano and entities that they own and/or control.

151.    PNC and RAMIREZ aided and abetted in the fraud (and other tortious acts) by, among other things: (a) suggesting, engineering and implementing the Workaround; (b) creating the Analysis Business Checking Account; (c) changing the name on the Fake Escrow Account, (on information and belief, in violation of its own internal policies for creating escrow accounts) (d) creating the Clearing Account; (e) allowing the Bad Actors to systematically misappropriate the money from the Fake Escrow Account into the Clearing Account and other accounts; (f) failing to inform Plaintiffs that the Fake Escrow Account was not really a legitimate escrow account; (g) failing to inform Plaintiffs that the Bad Actors were looting the Fake Escrow Account (h) failing to inform Plaintiffs that their money was being transferred from the Fake Escrow Account to the Clearing Account and to other accounts; and (i) failing and refusing to close the Fake Escrow Account and the Clearing Account until, on information and belief, May 2017.  PNC and RAMIREZ did all of this despite their intimate knowledge of the EB-5 program and the circumstances of the fraud. As a result, PNC and RAMIREZ were a proximate cause of Plaintiffs'

losses and are jointly and severally liable for them.  RAMIREZ and PNC's acts and omissions directly negatively impacted Plaintiffs, causing them substantial damages.

152.    Clearly, the misrepresentations regarding the escrow account and the creation and use of the Fake Escrow Account, aided and abetted by RAMIREZ and PNC's use of the Workaround, were critical aspects of the fraud, and were used to fraudulently induce Plaintiffs into investing in the Project.  So much so that these underlying acts form the basis for a variety of securities fraud claims brought by the United States Securities and Exchange Commission (the "SEC") against Walsh, SARC, Matthews and Palm House Hotel, LLLP, in which PNC is mentioned by name.

153.    On information and belief, PNC told anyone who called and asked if the Fake Escrow Account was an escrow account that it was.  In other words, even when asked directly by investors, PNC failed to disclose the Fake Escrow Account was fake.

154.    Plaintiffs wired their money into what they believed was a real escrow account, relying on the representations that it was a legitimate EB-5 escrow account and that their money would be safe until such time as their I-526 visa applications were approved.  The Fake Escrow Account was none of those things.

155.    The Bad Actors conspired to and moved Plaintiffs' money from the Fake Escrow Account to either the Clearing Account or to other accounts owned and/or controlled by the Bad Actors.  These transfers violated the rules and regulations of the EB-5 program and were illegal because they did not utilize Plaintiffs' EB-5 investment monies to create jobs, the only legal use for EB-5 investments.  RAMIREZ and PNC were fully informed by Walsh, SARC and USREDA, through Reitz, that the monies to be deposited into any account opened by them at PNC would be part of the EB-5 program.  PNC is intimately familiar with the EB-5 program, finances EB-5 projects, knows what the EB-5 program is, what EB-5 money may be used for and why creating, engineering and implementing the Workaround was illegal.  Indeed, RAMIREZ and PNC were

specifically told that the reason Walsh, SARC and USREDA wanted to work with them was to circumvent SunTrust's "obstacles and red tape."

156.    RAMIREZ and PNC, by virtue of their various acts and omissions, eliminated those "obstacles and red tape" and damaged Plaintiffs to the tune of tens of millions of dollars.  As such, RAMIREZ and PNC are also jointly and severally liable to Plaintiffs for the damages they incurred as a result of these various illegal transfers.

157.    Once Plaintiffs' funds were moved to the Clearing Account, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Herischi, Herischi & Associates LLC, and their agents transferred the funds to other accounts and used them for non-allowable purposes, siphoning off tens of millions of dollars for personal expenses and investments.  RAMIREZ and PNC, by virtue of their various acts and omissions, are also jointly and severally liable to Plaintiffs for the damages they incurred as a result of these various illegal transfers.

158.    Once Plaintiffs' funds were moved to the Clearing Account, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Herischi, Herischi & Associates LLC, and their agents used the funds to pay off participants in the fraudulent scheme.  PNC and RAMIREZ, by virtue of their various acts and omissions, are also liable to Plaintiffs for the damages they incurred as a result of these various illegal transfers.

159.    From the Clearing Account, the Bad Actors conspired to and illegally moved Plaintiffs' money to accounts belonging to, among others:

(a)    Leslie Robert Evans;

(b)    KK-PB Financial LLC;

(c)    Galle Law Group;

(d)    New Haven Contracting South, Inc.;

(e)    USREDA;

(f)    160 Royal Palm LLC; and

(g)    Palm House, LLC.

36

160.   Once Plaintiffs' funds were moved to the Palm House, LLC account, Gerry Matthews, Robert Matthews, Maria a/k/a Mia Matthews, and Nicholas Laudano, among others, transferred the funds to other accounts and used them for non-allowable purposes, siphoning off millions of dollars for personal expenses and investments.

161.   Once Plaintiffs' funds were moved to the Leslie Robert Evans Escrow Account, upon information and belief, Gerry Matthews, Robert Matthews, Maria a/k/a Mia Matthews and Nicholas Laudano used the funds to pay off other participants in the fraudulent scheme.

162.   As purported owners and/or managers and/or agents of Palm House LLC, Gerry Matthews, Robert Matthews, and Maria a/k/a Mia Matthews, knew that none of Plaintiffs' funds could be used unless and until Plaintiffs' I-526's had been approved by USCIS and then only for the lawful purpose of creating 10 jobs per EB-5 investor.

163.   While none of Plaintiffs' I-526's were approved, Palm House LLC, Gerry Matthews, Robert Matthews and Maria a/k/a Mia Matthews, among others, took Plaintiffs' money anyway, further demonstrating their fraudulent intent.  They were able to do this only because RAMIREZ and PNC allowed them to.

164.   Further, SARC, USREDA and Walsh owed Plaintiffs duties of care and loyalty, duties to exercise reasonable skill and ordinary diligence and a fiduciary duty to protect their funds, and not allow their release, unless and until Plaintiffs' I-526's were approved by USCIS and then only for the lawful purpose of creating 10 jobs per EB-5 investor.  RAMIREZ and PNC specifically knew that SARC, USREDA and Walsh owed Plaintiffs a fiduciary duty to protect their funds by virtue of Reitz' initial meeting with RAMIREZ and Osaba, wherein Reitz disclosed the following, among other things, to PNC:

(a)   Walsh, SARC and USREDA were working on EB-5 projects and were bringing in investors from China (at that time no Iranian or Turkish investors had been signed up yet);

(b)   there would be investors from other countries in the future;

(c)   each Chinese EB-5 investor was investing $500,000 plus an administrative fee of between $40,000 and $60,000;

(d)   there would be tens of millions of dollars running through any new accounts opened at PNC;

(e)   the EB-5 investment monies were subject to escrow agreements;

(f)   the relationship between Walsh, SARC and USREDA, because Walsh was in charge of the EB-5 projects and was making the decisions with respect to the EB-5 Investors' money;

(g)   Walsh and SARC already had an existing escrow account at SunTrust Bank;

(h)   Walsh was frustrated by what he felt were "obstacles and red tape" he was facing at SunTrust; and

(i)   Walsh, SARC and USREDA wanted a PNC escrow account that removed and/or eliminated the "obstacles and red tape" they were facing at Sun Trust.

165.   PNC received significant fees and costs for operating the Fake Escrow Account and the Clearing Account and was able to invest the tens of millions of dollars held in them for substantial profits.

166.   RAMIREZ earned substantial income from PNC, some of which was a direct result of the opening of the Fake Escrow Account and the Clearing Account. RAMIREZ was supremely motivated to earn Walsh, SARC and USREDA's business for this very reason which led him and PNC to create the Workaround.

167.   Other persons received improper transfers or were unjustly enriched as a result of the misappropriation of Plaintiffs' funds. These include Leslie Robert Evans and his law firm, Leslie Robert Evans & Associates, P.A., who paid themselves compensation from Plaintiffs' funds while they assisted the Bad Actors in their misappropriation and dissipation of the funds.

**PNC's Acts and Omissions Violated Banking Laws and Regulations**

168.   PNC violated the Bank Secrecy Act, 31 USC §5311, and the USA PATRIOT Act, 31 USC §5318, by aiding and abetting the fraud and by knowingly allowing itself to be used as an instrument of that fraud by

a)   suggesting, engineering and implementing the Workaround;

38

b) opening the Fake Escrow Account without the proper restrictions after knowing the purpose of the account;

c) improperly naming the Fake Escrow Account as an escrow account when it was not;

d) on information and belief, ignoring alerts that were generated by the bank's automated account monitoring system to identify suspicious activity;

e) ignoring the indicia of fraud when wire transfers were deposited into the Fake Escrow Account with different names on the wiring instructions than that of the Fake Escrow Account;

f) failing to identify the suspicious activity taking place in the Fake Escrow Account and Clearing Account; and

g) failing to halt the fraud and close the Fake Escrow and Clearing Account until on information and belief, May 2017.

**Where Things Stand Now**

169.  Subsequent to the misappropriation and distribution of Plaintiffs' funds, the Bad Actors brought lawsuits against each other, asserting weak and/or neutered claims, with the goal of creating yet another façade -- that they were actually attempting to pursue the claims, recoup the stolen money, and make Plaintiffs whole.

170.  Meanwhile, the Palm House Hotel is a wasting property and, in the words of the Court-appointed receiver, "circling the drain."  The Project is scheduled to be sold on March 8, 2019.

171.  On November 6, 2017, Robert Matthews filed bankruptcy in the United States Bankruptcy Court, Southern District of Florida, Case No. 17-23426-MAM.

172.  No Plaintiff has received an EB-5 visa, or an I-526 petition approval, and is unable to do so in the future.

173.    SARC, Walsh and Walsh, Jr. continue in their fraudulent conduct, seeking additional victims for their EB-5 schemes.  Walsh fled the United States and is hiding in Australia and Hong Kong, spending rotating 90-day periods in each location.

174.    Herischi admitted his role in the scheme and his receipt of secret, undisclosed kickbacks, despite owing a fiduciary duty to be a neutral attorney to the Iranian Victims.  See **Exhibit "Q."**

175.    Plaintiffs ask the Court for all necessary and appropriate relief, in law and equity, so that they may attempt to recover their stolen funds and begin rebuilding their lives.

**The Plea Agreements and Indictments**

176.    On March 14, 2018 in the case *United States v. Robert v. Matthews and Leslie R. Evans*, Criminal Case No. 3:18-CR-48-SRU, United States District Court, District of Connecticut, Robert Matthews was indicted on 20 counts of Wire Fraud, Bank Fraud, Conspiracy to Commit Wire Fraud and Bank Fraud, Illegal Monetary Transactions Using Wire Fraud Proceeds and Illegal Monetary Transactions Using Bank Fraud Proceeds in connection with his fraudulent conduct.

177.    On March 14, 2018 in the case *United States v. Robert v. Matthews and Leslie R. Evans*, Criminal Case No. 3:18-CR-48-SRU, United States District Court, District of Connecticut, Leslie Robert Evans was indicted on 11 counts of Wire Fraud, Bank Fraud, Conspiracy to Commit Wire Fraud and Bank Fraud, and Illegal Monetary Transactions Using Wire Fraud Proceeds. A copy of the indictment with respect to Robert Matthews and Leslie Robert Evans is attached as **Exhibit "R".**

On August 29, 2018 in the case *United States v. Robert v. Matthews and Leslie R. Evans*, Criminal Case No. 3:18-CR-48-SRU, United States District Court, District of Connecticut, a Superseding Indictment was issued which added a count of Tax Evasion against Robert Matthews and Maria a/k/a Mia Matthews.  A copy of the Superseding Indictment is attached as **Exhibit "S".**

178.    On March 13, 2018 in the case *United States of America v. Nicholas Laudano*, Criminal Case No. 3:18-CR-47-VAB, United States District Court, District of Connecticut, Nicholas Laudano pled guilty to 1 count of Conspiracy to Commit Bank Fraud and 1 count of Illegal Monetary Transaction and is facing up to 30 years in prison in connection with his fraudulent conduct. A copy of the information and plea agreement are attached as composite **Exhibit "T".**

179.    On March 13, 2018 in the case *United States of America v. Gerry Matthews*, Criminal Case No. 3:18-CR-43-VAB, United States District Court, District of Connecticut, Gerry Matthews pled guilty to 1 count of Conspiracy to Commit Wire Fraud and is facing up to 20 years in prison in connection with his fraudulent conduct. A copy of the information and plea agreement are attached as composite **Exhibit "U".**

180.    On August 3, 2018, in the case of *Securities and Exchange Commission v. Palm House Hotel, LLLP et al,* Case No. 9:18-cv-81038-XXXX, United States District Court, Southern District of Florida, the SEC sued Palm House Hotel, LLLP, SARC, Walsh and Matthews alleging claims for: (1) Violations of Section 17(a)(1) of the Securities Act, Violations of Section 17(a)(2) of the Securities Act; (3) Violations of Section 17(a)(3) of the Securities Act; (4) Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act; (5) Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act; (6) Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act; (7) Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act; and (8) Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act (the "SEC Complaint"). A copy of the SEC Complaint is attached hereto as **Exhibit "V".**

181.    With respect to PNC, the SEC Complaint stated:

**Misrepresentations Regarding Escrow Requirements and the Return of Investor Funds**

30. Between November 2012 and at least June 2014, PHH's offering materials contained material misrepresentations regarding PHH's use of an escrow account for investor funds. PHH falsely and fraudulently claimed that investor funds would be held in an escrow account at PNC

Bank, pursuant to an escrow agreement between PHH, SARC, and PNC Bank, through at least the filing of the investor's I-526 petition. Contrary to these representations, no escrow account even existed for investor funds. Prior to the PHH offering, the former CFO for SARC and USREDA informed Walsh that the account receiving investor funds would not even be administered by PNC Bank.

182.    All of the money utilized by Robert Matthews, Leslie Robert Evans, Nicholas Laudano and Gerry Matthews in connection with the transactions that culminated in the criminal prosecutions set forth above was accessed as a result of the Workaround.  PNC and RAMIREZ gave these alleged criminals and now convicted felons the proverbial "keys to the vault" which they then emptied to the profound detriment of the EB-5 Investors.

## COUNT I - Aiding and Abetting Fraud

183.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 182 as if fully stated fully herein.

184.    As specifically described above, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd., Nur, Herischi, Herischi & Associates LLC, and their agents committed a massive and far-reaching fraud against Plaintiffs.

185.    As a result of all of the information that was provided by Walsh, SARC and USREDA, via Reitz, regarding both the SunTrust escrow account and the intended use of the accounts they wished to open at PNC, combined with PNC's knowledge of the EB-5 program, PNC had specific knowledge or should have known that a fraud was being and had been committed upon Plaintiffs.

186.    PNC and RAMIREZ provided substantial assistance to advance the commission of the fraud against Plaintiffs by conceiving of, suggesting and implementing the Workaround, thus giving the Bad Actors unfettered access to Plaintiffs' EB-5 investment monies, which they promptly stole.

187.    Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do something, thereby enabling a fraud to occur.  PNC and

RAMIREZ did this here by conceiving of, suggesting and implementing the Workaround. PNC and RAMIREZ assisted the Bad Actors to legitimize their misrepresentations regarding the safety of an escrow account by creating the Fake Escrow Account for them.

188.    PNC and RAMIREZ provided substantial assistance through its actions and inaction.  Because PNC offered, created and implemented the Workaround, it knew the Bad Actors were holding Plaintiffs EB-5 investment funds in the Fake Escrow Account and about their ongoing fraud.  Under these particular circumstances, PNC's failure to warn Plaintiffs or stop the Bad Actors' fraud is substantial assistance.

189.    PNC and RAMIREZ therefore knowingly aided and abetted the commission of the fraud against Plaintiffs.

190.    Plaintiffs were severely damaged by PNC's actions and omissions.

WHEREFORE, Plaintiffs demand judgment against PNC and RAMIREZ, jointly and severally, for damages, costs, interest, prejudgment interest and such other relief as the Court deems proper.

## COUNT II – Aiding and Abetting Fraudulent Inducement

191.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 182 as if fully stated fully herein.

192.    As specifically described above, SARC, USREDA, Walsh, Walsh Jr., Payne, JJW Consultancy Ltd. Nur and their agents made knowingly false statements concerning material facts in the Offering Document.

193.    As specifically described above, SARC, USREDA, Walsh, Walsh, Jr., Payne JJW Consultancy Ltd, Nur and their agents, when marketing the project to the Plaintiffs (either directly or by and through their immigration agents), made knowingly false statements of material facts.

194.    Additionally, as specifically described above, Robert Matthews made knowingly false oral statements concerning materials facts when he sold the project to the Chinese Victims and the Turkish Victim in Palm Beach.

195.    SARC, USREDA, Walsh, Matthews, Walsh, Jr., Payne JJW Consultancy Ltd, Herischi, Herischi & Associates, LLC, Nur and their agents knew that their representations were false and intended the Plaintiffs to rely upon the representations and be induced by them to invest their money into Palm House Hotel, LLLP.

196.    Herischi and Herischi & Associates LLC adopted and sold the representations in the Offering Documents when selling the Palm House Hotel project to the Iranian Victims. Additionally, Walsh, Herischi, and Herischi & Associates LLC made knowingly false oral statements concerning material facts when they sold the Palm House Hotel project to the Iranian Victims.

197.    Herischi and Herischi & Associates LLC also failed to disclose to their clients, the Iranian Victims, that they were receiving secret, undisclosed kickbacks of $40,000 for each investor they delivered into the Palm House Hotel project.

198.    Nur also failed to disclose to his client, the Turkish Victim, that he received a secret, undisclosed kickback for delivering the Turkish Victim into the Palm House Hotel project.

199.    The notion of an escrow account was intended to enable the fraud and theft by giving the Chinese Victims, the Iranian Victims and the Turkish Victim the assurance that their money was safe, and that it would only be used if and when their I-526 were approved.

200.    Instead, using the Workaround and the Fake Escrow Account, Plaintiffs' EB-5 Investment monies were stolen, no EB-5 jobs were created, let alone the 10 jobs per investor necessary to get their permanent visas.   Moreover, after their I-526's were properly denied, Plaintiffs got not one cent of their money back.

201.    Plaintiffs relied upon these representations and have been damaged.

202.    PNC and RAMIREZ, as a result of all the information that was provided by Walsh, SARC and USREDA, via Reitz, regarding both the SunTrust escrow account and the intended use of the account they wished to open at PNC, combined with PNC's knowledge of the EB-5 program, had specific knowledge or should have known that Plaintiffs had been fraudulently induced into investing in the Project.

203.    PNC and RAMIREZ provided substantial assistance to advance the commission of the fraud in the inducement or encouraged it or enabled it against Plaintiffs by conceiving of, suggesting and implementing the Workaround, thus giving the Bad Actors unfettered access to Plaintiffs' EB-5 investment monies, which they promptly stole.

204.    Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do something, thereby enabling a fraud in the inducement to occur. PNC and RAMIREZ did this here by conceiving of, suggesting and implementing the Workaround. PNC assisted the Bad Actors to legitimize their misrepresentations regarding the safety of an escrow account by creating the Fake Escrow Account for them.

205.    PNC and RAMIREZ provided substantial assistance through its actions and inaction. Because PNC and RAMIREZ offered, created and implemented the Workaround, they knew that the Bad Actors were holding Plaintiffs EB-5 investment funds in the Fake Escrow Account and about their ongoing fraud in the inducement. Under these particular circumstances, RAMIREZ and PNC's failure to warn Plaintiffs or stop the Bad Actors' fraud is substantial assistance.

206.    PNC and RAMIREZ therefore knowingly aided and abetted the commission of the fraud in the inducement against Plaintiffs.

207.    Plaintiffs were severely damaged by RAMIREZ and PNC's actions and omissions.

WHEREFORE, Plaintiffs demand judgment against RAMIREZ and PNC, jointly and severally, for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

### COUNT III – Aiding and Abetting Breach of Fiduciary Duty

208.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 182 as if fully stated fully herein.

209.    Walsh, SARC and USREDA owed Plaintiffs fiduciary duties.  RAMIREZ and PNC knew Walsh, SARC and USREDA owed fiduciary duties to Plaintiffs. This is because of the very detailed and specific knowledge provided by Walsh, SARC and USREDA, through Reitz, regarding the SunTrust escrow account and the intended use of the accounts they wished to open at PNC, combined with PNC's knowledge of the EB-5 program.  PNC had specific knowledge or should have known that a breach of fiduciary duty was being and had been committed upon Plaintiffs.

210.    Walsh, SARC and USREDA breached their fiduciary duties to Plaintiffs.

211.    PNC and RAMIREZ had knowledge that Walsh, SARC and USREDA breached their fiduciary duties to Plaintiffs, including the duty to hold Plaintiffs' funds in the Fake Escrow Account.

212.    PNC and RAMIREZ knowingly aided and abetted the commission of the breach of fiduciary duties against Plaintiffs by conceiving of, suggesting and implementing the Workaround, thus giving the Bad Actors limitless access to Plaintiffs' EB-5 investment monies, which they promptly stole.

213.    PNC and RAMIREZ substantially assisted or encouraged SARC, Walsh, and USREDA to breach their fiduciary duties by conceiving of, suggesting and implementing the Workaround, thus giving the Bad Actors unfettered access to Plaintiffs' EB-5 investment monies, which they promptly stole.

214.     Plaintiffs were severely damaged by the actions of PNC and RAMIREZ.

WHEREFORE, Plaintiffs demand judgment against RAMIREZ and PNC, jointly and severally, for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

### COUNT IV – Unjust Enrichment

215.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 182 as if fully stated fully herein.

216.     As a result of the unlawful actions of the Bad Actors, RAMIREZ and PNC, Plaintiffs have directly or indirectly (by the Bad Actors use of their EB-5 investment monies) conferred a benefit on PNC in the form of (a) monthly account fees paid to PNC with respect to the Fake Escrow Account and the Clearing Account; (b) wiring fees paid to PNC in connection with the Fake Escrow Account and the Clearing Account; and (c) interest earned on the tens of millions of dollars in EB-5 investment monies held in the Fake Escrow Account and the Clearing Account.

217.     PNC was aware of the benefits conferred on it by Plaintiffs and have been unjustly enriched by the benefits.

218.     PNC voluntarily accepted and retained the benefits conferred on it by Plaintiffs.

219.     The circumstances are such that it would be inequitable for PNC to retain the benefits obtained by it as a result of the actions of the Bad Actors, RAMIREZ and PNC itself.

WHEREFORE, Plaintiffs demand judgment against PNC, for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

### COUNT V – Equitable Accounting

220.     Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 182 as if fully stated fully herein.

221.  A fiduciary relationship existed between Plaintiffs and Walsh, SARC and USREDA.

222.  PNC and RAMIREZ asked about and were fully informed of the fiduciary relationship that existed and exists between Plaintiffs and Walsh, SARC and USREDA. See paragraphs 16, 20, 155 and 164 above. Walsh, SARC and USREDA breached their fiduciary duties to Plaintiffs.

223.  PNC and RAMIREZ had specific or should have known that the Bad Actors breached their fiduciary duties to Plaintiffs, including the duty to hold Plaintiffs' funds in escrow.

224.  PNC and RAMIREZ knowingly aided and abetted the Bad Actors' commission of the breach of fiduciary duties against Plaintiffs by conceiving, offering and implementing the Workaround.

225.  RAMIREZ and PNC substantially assisted and enabled SARC, Walsh, and USREDA to breach their fiduciary duties.

226.  Further, the fraud and breach of fiduciary duties perpetrated upon Plaintiffs was an extremely extensive, complex transaction, whereby Plaintiffs' funds were transferred between and among many accounts, laundered through numerous entities, and ultimately used for personal, inappropriate and unlawful purposes.

227.  Plaintiffs' funds, which were transferred from the Fake Escrow Account and Clearing Account without any authorization from Plaintiffs, and the subsequent unauthorized transfers and transactions involving these funds, are so involved and complicated that a remedy at law is insufficient to administer complete justice.

228.  Plaintiffs are entitled to receive information regarding transactions involving any of the funds traceable to them.

229.  Plaintiffs have requested information on the transfers of their funds, transactions involving their funds, and the present location of their funds, which has not been provided.

WHEREFORE, Plaintiffs respectfully request that this Court order PNC to provide a full and complete accounting of its finances, operations, and transactions involving any funds traceable to Plaintiffs, including but not limited to the Fake Escrow Account and the Clearing Account, provide Plaintiffs with the location and amount of all accounts containing any funds traceable to Plaintiffs, impose a constructive trust over all amounts and profits to which Plaintiffs are determined to be entitled to, and to grant such other and further relief as the Court deems just and proper.

## COUNT VI – Aiding and Abetting Conversion

230.    Plaintiffs adopt and re-allege the allegations set forth in paragraphs 1 through 182 as if fully stated fully herein.

231.    The Bad Actors and the Evans Bad Actors' improper taking and retention of property and payments which belong to Plaintiffs give rise to a claim for conversion.  The Bad Actors and the Evans Bad Actors have, without authorization, asserted dominion and control over the funds which are the specifically identifiable property of Plaintiffs and are or were the property of Plaintiffs and which were owned or payable to Plaintiffs.  The Bad Actors and Evans Bad Actors' conversion is inconsistent with Plaintiffs' rights and ownership to said property.

232.    The payments and property wrongfully converted by the Bad Actors and the Evans Bad Actors are specific and identifiable.

233.    By virtue of the Bad Actors and Evans Bad Actors' repeated and continued misappropriation and conversion of Plaintiffs' property, they have caused Plaintiffs substantial economic harm.

234.    Many of Plaintiffs have made a demand for the return of their property, but the funds have not been returned.  Moreover, a demand for the return of Plaintiffs' funds would be futile.  The Bad Actors and the Evans Bad Actors have been confronted with the fact that they converted Plaintiffs' property but have failed to return all of the property to Plaintiffs.

235.     PNC and RAMIREZ had specific knowledge or should have known that Plaintiffs' property from the Fake Escrow Account was converted, as the Fake Escrow Account was created for that very purpose (i.e., to avoid SunTrust's "obstacles and red tape").

236.     PNC and RAMIREZ therefore knowingly aided and abetted the conversion of Plaintiffs' EB-5 investment monies by the conception, creation and implementation of the Workaround.

237.     PNC and RAMIREZ substantially assisted or enabled the conversion of Plaintiffs' EB-5 investment monies from the Fake Escrow Account.

238.     Plaintiffs were severely damaged by the actions of RAMIREZ and PNC.

WHEREFORE, Plaintiffs demand judgment against PNC and RAMIREZ, jointly and severally for damages, costs, interest, prejudgment interest, and such other relief as the Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated this 1st of March, 2019.

**GEORGE GESTEN MCDONALD, PLLC**
9897 Lake Worth Road, Suite #302
Lake Worth, Florida 33467
Telephone:     (561) 232-6002
Toll Free:         (833) FINDJUSTICE
                        (833) 346-3587
Fax:                 (888) 421-4173
E-Service:      EService@4-justice.com

By:    _/s/   David J. George_____
       **DAVID J. GEORGE, ESQ.**
       Florida Bar Number: 898570
       Emails:    DGeorge@4-Justice.com
       **RYAN D. GESTEN, ESQ.**
       Florida Bar Number: 240760
       Emails:    RGesten@4-Justice.com
       **MATTHEW R. CHIAPPERINI, ESQ.**
       Florida Bar Number: 111417
       Emails:    MChiapperini@4-Justice.com